IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | Crim. No.  2:21-CR-243 |
| | : | |
| PEDRO PEREZ | : | |
| | : | |

**DEFENDANT PEDRO PEREZ'S SENTENCING MEMORANDUM**

Pedro Perez, through his counsel Lawrence J. Bozzelli, respectfully submits the following Defense Sentencing Memorandum in the above cited case.

In summary, Mr. Perez would respectfully recommend that this Court sentence him to 40 months of imprisonment which is slightly lower than the range that the defense has calculated in its Guideline range but the defense believes that this is an appropriate sentence for the reasons articulated below.

I.  **INTRODUCTION**

On February 23, 2022, a grand jury in the Eastern District of Pennsylvania returned a 17 count Superseding Indictment charging 17 defendants with conspiracy to distribute 400 grams or more of fentanyl, 280 grams or more of cocaine base.  Included amongst these 17 defendants was Pedro Perez. Perez, was charged in Counts 1 and 11, of the Superseding Indictment. On March 20, 2025, the defendant appeared before the Honorable John Milton

1

Younge and pled guilty to these two counts which are Conspiracy to distribute 400 grams or more of fentanyl, 280 grams or more of cocaine base "crack", and cocaine [Count 1] and Possession with the intent to distribute, and aiding and abetting the distribution of 400 grams or more of fentanyl, cocaine base ("crack") and cocaine [Count 11].

II.   **DEFENDANT'S BACKGROUND AND LIFE CIRCUMSTANCES**

Pedro Jose Perez was born on May 9, 1985, in San Francisco de Macorís, in the Dominican Republic, to Pedro Perez, Sr. and Alida Paulino.  The defendant's parents were married during his childhood. While they were in the Dominican Republic, his father worked farming "cocoa." When the defendant was approximately three years old, his family moved to the Bronx, New York. When the defendant was "12 or 13" years old, his family moved to Philadelphia because they "had family in Philadelphia and the cost of living was cheaper than New York." The defendant said that his childhood was "good until we moved to Philly." He stated, "That was when everything became crazy. I was always fighting because other kids were bullying me. I didn't know anybody."  The defendant said that his father visited the Dominican Republic frequently when the defendant was a child and his father moved back to the Dominican Republic.  The defendant is single and is a father of five children. He was in a relationship with Bernalia Duartes and their relationship produced two children. Christopher Perez (19) works in a medical office and Angel Perez (age 18) works at FedEx. They live in Philadelphia and visit the defendant at FDC Philadelphia.  He has one child, daughter Emma Perez (13) who is currently in the eighth grade with Ms. Vannessa Lopez.  He also has two

2

other children with Vivian Ayala.  The defendant said that he would like to pursue court-ordered visitation when he is released. He is currently ordered to pay child support. A copy of the defendant's credit report showed that he is paying as agreed.  Prior to the defendant's reported visit to the Dominican Republic in March 2022 and subsequent arrest in 2023, he lived with his mother and sister, Vickiana, at 2080 Margaret Street in Philadelphia, a home owned by the defendant's mother.  See PSR ¶55-64.

### III.     POST-*BOOKER* SENTENCING IN THE THIRD CIRCUIT

After the Supreme Court's decision in **United States v. Booker**, 543 U.S. 220, just as before it, a sentencing court must correctly calculate a defendant's guideline range and then consider whether there is any basis set forth in the Guidelines Manual to "depart" from the range. However, the practical effect of **Booker** was to add a third step in the sentencing process— namely, the court's decision whether, after considering all of the factors in 18 U.S.C. § 3553(a), a sentence outside of the applicable guideline range should be imposed as a "variance."  See USSG §1B1.1, comment. This **Booker** "three-step process" requires "respectful consideration" of the Guidelines Manual in all three steps. See **Kimbrough v. United States**, 552 U.S. 85, 101 (2007).  The three steps are: (1) to initially calculate the sentencing range; (2) to consider policy statements or commentary in the Guidelines Manual about departures from the guideline range; and (3) to consider all of the § 3553(a) factors (which include the guidelines, commentary, and any relevant policy statements in the Guidelines Manual) in deciding what sentence to impose, whether within the applicable range, or whether as a departure or as a variance (or as both). See **Gall v. United States**, 552

3

U.S. 38, 50 n.6 (2007) ("The fact that §3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." ).

A district court commits procedural error when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence. **United States v. Genao**, 869 F.3d 136, 140 (2d Cir. 2017).

## IV. THE PURPOSE OF SENTENCING

The Courts have long understood that sentencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation. Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community? See **United States v. Cole**, 622 F.Supp.2d 632 (N.D. Ohio 2008)

Federal sentencing law generally tracks these purposes. Section 3553 tells the Federal Courts to choose a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law (retribution, general deterrence), provides just punishment for the offense (retribution), affords adequate deterrence to criminal conduct (general

4

deterrence), protects the public from further crimes of the Defendant (specific deterrence, incapacitation), and provides the Defendant with needed training, care, and treatment (rehabilitation). 18 U.S.C. § 3553(a)(2).

### RETRIBUTION

One can say that "retribution" imposes punishment to reflect respect for the dignity of the victim. In other word, society stands with victims and exacts punishment in rough approximation to the detriment caused by the defendant. This causes the Court to examine the defendant's past actions and the effect of these actions on the victim or victims of the crime. The problem is that the Court usually does not focus on the defendant's probable future positive behavior or the effect that his punishment might have on others in society [i.e., his family].

In Perez's case, the crimes he is charged with have no direct victim. Naturally, cocaine and fentanyl have serious consequences and have decimated the lives of countless citizens of Philadelphia. Perez accepts responsibility for personally distributing large quantities of cocaine. He also accepts that he was part of a criminal conspiracy that worked to distribute large amounts of drugs laced with fentanyl. The defendant would ask that the Court consider as part of his retribution the fact that he has now been in Federal custody since August 27, 2023 which is almost 2 years of his life and he is facing another 2 or 3 years of confinement.

## REHABILITATION

The goal of rehabilitation is the attempt to turn one person's path away from crime and towards being a productive, law-abiding citizen.

In the instant case, Pedro Perez is already making plans to return to his family and avoid any further criminal conduct. These past 2 years are the longest period of time that Perez has ever spent in jail. In fact, this is the only time that Perez has ever spent in jail. Although he has two prior convictions, they are over 10 years ago and were non-custodial sentences. As acknowledged in the draft PSR, Perez is a Zero Point Offender. See PSR ¶42. This time in jail has been an eye-opening experience for him. As Pedro has echoed to me in our talks, being incarcerated exposed him to some of the most dehumanizing and traumatic conditions imaginable. His 2 years at the FDC has been plagued by violence, neglect, and psychological isolation. He is confined to a small and filthy cell with little access to natural light, fresh air, or meaningful human interaction. The constant noise, lack of privacy, and fear of harm has led to severe anxiety, depression, and emotional numbness. Even basic healthcare and hygiene are frequently neglected. The defense points out that the words "I'll never do anything to go back to jail" has more weight when spoken by someone who has never been through the experience of jail as opposed to a repeat offender. The defense would ask your Honor to consider these factors and that his is Perez's first time in jail when fashioning a sentence.

6

## INCAPACITATION

Incapacitation refers to the restriction of an individual's freedoms and liberties that they would normally have in society. By incapacitating the convicted offender, we prevent the individual from committing future crimes because he is removed from society and locked up or restrained somehow.

In this case, Perez would argue that he has been in custody for almost 2 years and that this has accomplished the mission of preventing him from committing future crimes. As mentioned, above Perez has never experienced prison life and is committed to walking the straight and narrow path once released.

## DETERRENCE

Deterrence has both a specific and a general function. Specific deterrence dissuades the particular defendant from engaging in criminal conduct. In contrast, general deterrence discourages others from engaging in similar criminal conduct.

Another problem with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195 (1790).

The structure and discipline imposed during incarceration can prompt self-reflection,

leading some individuals to reconsider their life choices and commit to making better decisions in the future

The Court should respectfully consider that Pedro Perez's time in prison has already acted as a powerful deterrent by forcing Pedro to confront the stark consequences of his actions. The loss of his freedom, Pedro's separation from his family and 5 children, and daily restrictions on even the most basic personal choices serve as a sobering reminder of the cost of his criminal behavior. As I expect, Pedro plans to personally explain at sentencing how the harsh and isolating environment of prison created a deep desire to avoid repeating his bad behavior.

### IV.   THE APPLICATION OF DEPARTURES AND VARIANCES

The Third Circuit specifically endorses the terminology of "departure" to refer to a sentence outside of the range that was contemplated by the guidelines system, and "variance" to refer to a sentence outside of the range that was imposed under the court's discretion pursuant to §3553(a). It asks that district courts and counsel employ this terminology as well. ***United States v. Jackson***, 467 F.3d 834, n.2 (3d Cir. 2006).

### V.   DOWNWARD DEPARTURE CONSIDERATIONS

The defense could not locate any additional downward departures that apply in this case.

## VI. IMPORTANT FACTORS TO CONSIDER PRIOR TO SENTENCING PURSUANT TO §3553(a) / VARIANCES FROM THE SENTENCING GUIDELINES

**(1) PEREZ DISAGREES WITH THE DRAFT PSR REGARDING HIS BASE OFFENSE LEVEL**

Perez has objected to the calculations in the draft PSR which suggest that the Base Offense Level should be a 32. The defendant believes it should be a 30 based on the drug weight. The level of 30 applies to "at least 400 G but less than 1.2 KG of Fentanyl" and the level of 32 is between 1.2 KG and 4 KG. In this case, the defense argues that the Guilty Plea and the Change of Plea memorandum support Perez's understanding that he was accepting responsibility for the distribution of at least 400 G but less than 1.2 KG of Fentanyl.

The defendant always believed that his Guideline range was at a 30 due to the weight of the drugs he was responsible for distributing. This is the amount the defendant understood that he was pleading guilty to when he made his agreement. The written documents confirm his belief. For example, the terms of the written guilty specifically refers to the "level 30 range" when it states "The defendant agrees to plead guilty to Counts One and Eleven of the Superseding Indictment charging him with conspiracy to distribute **400 grams or more of fentanyl, 280 grams or more of cocaine base "crack"** and possession with the intent to distribute, and aiding and abetting with the intent to distribute **400 grams or more of fentanyl, cocaine base** … arising from his involvement in a widespread conspiracy …" [GPA, para 1, 3] If the intent was to link Perez to the distribution of 1.2 KG to 4KG of fentanyl, then the defendant argues the plea agreement would have used this language and not the language of the lower amount.

9

This very same language is repeated in the change of plea memorandum where the weight is given as 400 grams or more of fentanyl. The defense talks about this in more detail with another objection below, but in short, the evidence the defense reviewed did not show Perez to be a steady and constant supplier of drugs and certainly not fentanyl.

Obviously, "400 grams or more" covers 1.2 KG and above. However, Perez did not envision that was the weight he was accepting responsibility for. To be very clear, Perez admits that he sold drugs to co-defendant Velazquez on more than one occasion, but never fentanyl and not in the larger amount calculated in the draft PSR. As a result, this drug weight as calculated in the draft PSR is conclusory and is lacking in any specific factual basis.

"When a defendant challenges one of the factual bases of his sentence as set forth in the PSR, the Government has the burden of establishing the disputed fact by a preponderance of the evidence. ***United States v. Alston***, 895 F.2d 1362, 1373 (11th Cir.1990); ***United States v. Lawrence***, 47 F.3d 1559 (11th Cir. 1995)

Respectfully, the defendant would ask to lower the drug weight to be in line with the guilty plea which would lower the Base Offense Level to 30 and make the ultimate range 23/I which is 46-57 months.

**(2) PEDRO PEREZ'S ROLE IN THE DRUG ORGANIZATION**

Pedro Perez has fully accepted his responsibility in being part of this drug trafficking group. At the same time, he has always maintained that the role that the prosecution originally painted of him as being a big time player in this group is not accurate. To this

10

extent, Perez objects to the language in the PSR that reads "Perez … regularly delivered kilogram quantities of fentanyl to the DTG at various stash houses [and] Velazquez would also regularly pick up kilogram quantities of fentanyl from Perez …"

Perez has always maintained that he never knowingly sold fentanyl to anyone in the DTG. At best, Perez said he sold what he believed to be tranquilizer he bought from the website AliBaba. It is thought that this may have actually been fentanyl. However, Perez said that cocaine and tranquilizer were all he ever sold and he never sold fentanyl. I mentioned this assertion several times to AUSA Grenell because I foresaw a problem at the Change of Plea hearing if the factual basis mentioned the sale of fentanyl by Perez. Namely, he would refuse to admit to those facts.

Defense counsel believes that Mr. Grenell accommodated the defense when reading the very generic language used in the factual basis which states "PEREZ was recorded on a judicially authorized wiretap. In these calls PEREZ **talked about supplying** the charged controlled substances to VELAZQUEZ. PEREZ was surveilled and photographed meeting with VELAZQUEZ and an unidentified Mexican male touring VELAZQUEZ's various drug corners. FBI followed the three as they went to various corners showing the unidentified Mexican the breadth of the operation. Also, **some of the drugs in the house** at 4136 N. Reese Street **were supplied by PEREZ**. Supporting this are calls on June 23, 2021, the day before the take down, in which PEREZ said he is going to bring drugs to Reese Street." In fact, in one of the recorded calls there is talk about drugs that were delivered by Perez to the group and the poor quality of it. In that call, they speak of "smoking" it which is not a way in which fentanyl is consumed. Now, Perez understands that as the result of the

11

conspiracy charge of Count 1, he is accountable for the distribution of fentanyl because the group do so. He does not deny his culpability on that end which is why he voluntarily plead guilty to these charges.

### (3) SIMILARLY SITUATED CO-DEFENDANTS

Pedro Perez argues that a sentence of 40 months is an appropriate and sufficient sentence especially when compared to other co-defendants.

As taken from the sentencing memorandum of co-defendant Reggie Perez "REGGIE PEREZ was a member of a sophisticated and well-sourced drug trafficking operation designed to flood the streets of this community with a large, steady flow of dangerous drugs. On June 24, 2021, pursuant to a federal search warrant, agents searched 1720 W. Allegheny Avenue, which was occupied by REGGIE PEREZ, who was taken into local custody. Specifically, on the second floor, front room of 1720 W. Allegheny Avenue, where Reggie PEREZ was arrested, agents found 3,274 packets of fentanyl stamped with multiple stamps and two clear plastic bags with bulk fentanyl (approximately 8.5 grams). The stamps on the fentanyl were some of the known stamps of the DTO that had been distributed throughout the DTO's ten corners. They included the PA lottery symbol stamp, Banshee, Tesla, Suzuki, Happy City, and Lukoil. These were all stamps commonly used by this DTO." [ECF 426]

As taken from the sentencing memo of John Angel Velazquez, "On June 24, 2021, pursuant to a federal search warrant agents searched 4136 Reese Street, the main bag house in this case. In that property were approximately 1.6 kilos of fentanyl, 1.5 in bulk form and approximately 190 grams packaged for redistribution. The house also had approximately 10

12

grams of bulk crack and 10 grams of cocaine. The defendant was upstairs in the property at the time of the search. The lay out was set up in tables for packaging and processing. One table had grinders to cut in the xylazine (horse tranquilizer) that was also found in the property and the other table was set up to package the drugs into individual bags. The house was set up as a drug packaging house, and no one lived at the property." [ECF 425=]

Counsel assumes that Reggie Perez and John Angel Velazquez were either men who worked as baggers or custodians of the drugs that were stored in his house. If that is the case, then the defense argues their sentences of 30 months and 40 months respectfully is consistent with their roles in the organization. The defense argues that men who break down the drugs for distribution into society bare a heavy burden and an important role in any drug trafficking organization. The defendant argues that his role in delivering the drugs is comparable to those who then prepare it for mass distribution.

**(4) ACCEPTANCE OF RESPONSIBILITY AND COMMITMENT TO DOING THE RIGHT THING**

The defense would point out that one great example of Perez's character is reflected in the 1 write-up he has incurred in the 2 years that he has been at the FDC. On April 24, 2024, Perez was sanctioned "for possessing drugs/alcohol" and was punished accordingly. Perez explained that life inside of the FDC was a toll on his mental health and he attempted to alleviate it through self-medication. To his credit, Perez stated at the Disciplinary Hearing, "I am sorry. It will not happen again." PSR 11. As he stated, it has not happened again and he never received another infraction. This is a true sign that Perez can be trusted to walk the right path after he is confronted with the error of his ways.

13

**(5) STRONG FAMILY SUPPORT**

Pedro Perez has always enjoyed a strong support network in the form of his family. The defense has included several letters in support of his otherwise good character. In short, the defendant has a network that is ready to stand behind him and lead a law abiding life. See exhibit A.

**VII.   CONCLUSION**

For the reasons outlined above, Pedro Perez would plead with the Court to sentence him to a 40 months for his role in this drug trafficking organization. This sentence is sufficient, but not greater than necessary to achieve the goals as outlined above.

Respectfully submitted,

LAWRENCE J. BOZZELLI
Attorney for Pedro Perez

Date: June 30, 2025